UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:21-cv-00373-FDW-DCK

| | | |
|---|---|---|
| ROBERT OWENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| NORTHWOOD RAVIN, LLC, and NWR | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment, (Doc.

No. 19). The motion has been fully briefed and is now ripe for review. For the reasons set forth

below, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion.

## I. BACKGROUND[1]

Plaintiff Robert Owens ("**Plaintiff**") filed this action asserting claims arising from his

employment by Defendants Northwood Ravin, LLC and NWR Services, LLC (collectively

"**Defendants**"). (Doc. Nos. 1, 19).

David Ravin ("**Ravin**") founded Northwood Ravin, LLC ("**Northwood Ravin**") in 2011,

as a real estate development company that owns and leases apartment, including the property at

issue in this case—the "luxury high-rise" apartment building called The Vue. (Doc. No. 20, p. 2).

NWR Services, LLC ("**NWR**") employs Northwood Ravin's employees. (Doc. No. 20, p. 1; Doc.

No. 19-6, p. 7–9). Plaintiff began working for Defendants as The Vue's Service Manager on

---

[1] The background set forth herein is taken from a combination of the parties' briefing and attached exhibits. The
background is taken in the light most favorable to Plaintiff as the nonmoving party.

1

January 24, 2018, and he later signed a lease agreement to live at The Vue at the Employee Apartment Discount rental rate. (Doc. No. 26, p. 1; Doc. No. 20, p. 3; Doc. No. 19-23).

According to the job description, as a full-time employee, the Service Manager's "role is to ensure that the physical aspects of the property meet company standards for safety and appearance," and in doing so they "must focus on team leadership . . . ." (Doc. No. 19-19, p. 1; see also Doc. No. 20, p. 2). The position further required Plaintiff to supervise a team of three service technicians: Jay Bryant ("**Bryant**"), Eduardo Salazar ("**Salazar**"), and Nelson Pedraza ("**Pedraza**"). (Doc. No. 20, p. 2). According to Plaintiff, his "number one job [was] to make sure the property as a whole is taken care of. That include[d] delegating people and delegating tasks." (Doc. No. 19-2, p. 26–29, 100).

Plaintiff "did a good job during the first year of his employment," but during the Fall of 2019, things began to change. (Doc. No. 20, p. 3; Doc. No. 26, p. 1–2). Management became increasingly concerned about Plaintiff's attendance, frequent tardiness, failure to properly clock in and out consistently, and delay in resolving work orders. (Doc. No. 20, p. 3; Doc. No. 19-24). To that end, Briana Cameron ("**Cameron**"), The Vue's Community Manager at that time, sent Plaintiff an email on October 7, 2019, entitled "Time and Attendance," which reminded Plaintiff that it was "incredibly important that [he] remember to clock in and out every day," and noted that she had to manually enter Plaintiff's records thirty-six (36) times between August 12 and October 7. (Doc. No. 19-11, p. 1–3). Additionally, Defendants allege Marty Kessans ("**Kessans**"), the Area Service Manager at the time, had multiple discussions with Plaintiff concerning his attendance, punctuality, leadership, and average work order completion time, from "mid to late 2019 and in 2020." (Doc. No. 19-9, p. 2–3). Finally, Plaintiff's annual Performance Evaluation

on October 17, 2019 gave positive reviews related to his overall performance, but reflected that improvement was needed for the average completion time for work orders, attendance and punctuality, and correctly using the Paycom time sheet system. (Doc. No. 19-24).

During the Fall of 2019, Plaintiff's infant-daughter, Lucy, began experiencing medical issues. (Doc. No. 26, p. 2). As a result, both Plaintiff and Lucy's mother had to take time off work to care for her. (Id.; Doc. No. 20, p. 4). On November 28, 2019, after Lucy was hospitalized, Plaintiff emailed his supervisor, Tiffany Edwards Cruz ("**Cruz**"), to inquire about whether he should file for FMLA leave. (Doc. No. 19-25, p. 1–3). During this exchange, Plaintiff stated, "I really don't want to file because I'm so close to a new year I would suspect to possibly if all goes well miss another two to three days this year at most." (Doc. No. 19-25, p. 1). Cruz responded that she would approve any additional time off that Plaintiff needed through the end of the year, which was "not an unreasonable request," and that he need not worry about FMLA leave. (Id.) Then again, on December 3, 2019, Plaintiff emailed Renee Brown ("**Brown**"), the Vice President of Human Resources, to ask whether he should file for FMLA leave for the remainder of the year. (Id. at 4–5). He again stated he did not want to file for FMLA leave, but that because he already used all of his PTO, he did not want to "get into any trouble." Id. Brown responded approximately an hour later to schedule a call for 10:00 a.m. on December 4, during which they could discuss FMLA leave as an option. Id. at 4. Following this exchange, Plaintiff and Brown had a conversation concerning his situation and FMLA leave. They "decided . . . that if and when [Plaintiff] had something come up, . . . [Defendants would] certainly work with" him to get any FMLA paperwork required once it became clearer that Plaintiff would need additional leave. (Doc. No. 19-7, p. 3–4, 6). Defendants agreed that they would work with Plaintiff to allow him to care

3

for his daughter as needed—which both parties agree Defendants did—and neither party took further action concerning FMLA protection after December 2019. (Doc. No. 20, p. 5; Doc. No. 26, p. 2). Plaintiff would have flexibility in terms of his hours, as long as Plaintiff was getting his job done. (Doc. No. 19-2, p. 95; Doc. No. 20, p. 5; Doc. No. 26, p. 2).

In early 2020, Plaintiff met with management, including Cruz, Brown, Mark Stressman, and Amanda Kitts, as part of a departmental evaluation, during which they discussed logistics and procedures concerning the property in general in addition to management's concerns surrounding Plaintiff's attendance. (Doc. No. 26, p. 2; Doc. No. 19-2, p. 94–95). Specifically, Defendant's deposition indicates Amanda Kitts ("**Kitts**"), the Senior Vice President of Property Management for Defendants, stated that she understood Plaintiff's situation, and that she did not "care about [Plaintiff's] hours," but that their arrangement was expressly "contingent upon . . ." fulfilling his job requirements at The Vue. (Doc. No. 19-2, p. 95–96). However, the Fire Marshall conducted an inspection of The Vue on February 5, 2020, which Plaintiff was absent for, and his report found five pages of violations. Further, in late March or early April of that year, Plaintiff's entire team complained to Kessans regarding Plaintiff's "lack of leadership and lack of engagement," (Doc. No. 27–2, p. 8), noting Plaintiff was difficult to locate and "wasn't doing his job. The property was not taken care [of]. Work orders were not getting done. His team could not order supplies. He wasn't keeping the supplies up so his team could do their work. He wasn't being a supervisor. He was not leading his team." (Doc. No. 19-5, p. 13). After Kessans made Ralph Smith ("**Smith**"), the Senior Director for Property Turnover and Special Projects for Defendants, aware of the team's complaint, both Smith and Kessans had separate conversations with Plaintiff to address their concerns related to his attendance and overall performance. (Doc. No. 19-5, p. 16; Doc. No. 19-

4

9, p. 2–4).  Still, Plaintiff received positive feedback from management in April during a Maintenance Challenge and Spring-Cleaning project, (Doc. Nos. 19-27, 19-28).

In May of that year, Plaintiff began experiencing symptoms of COVID-19.  (Doc. No. 19-2, p. 105).  He went to the Emergency Room,  and though he never received a positive test result, he was instructed to quarantine from May 1 through May 12.  (Id. at 106; Doc. No. 19-34, p. 8).  Plaintiff emailed Brown on May 4 to request emergency time off. (Id. at 5–9).  After Plaintiff provided a doctor's note indicating he needed to quarantine, she filed the necessary paperwork to approve Plaintiff's paid sick leave under FFCRA commencing on April 30 and expiring on May 11.  (Doc. No. 19-2, p. 109–10; Doc. No. 26, p. 3) (See also Doc. No. 22-4, p. 12).  Plaintiff returned to his position as Service Manager on May 12.  (Doc. No. 19-2, p. 112).

After Plaintiff returned to work, Smith spoke with Plaintiff in The Vue's parking lot, questioning his passion for his job and informing him that there were "some trust issues" within Plaintiff's team.  (Id. at 114).  Meetings and other communications between various members of The Vue's management team took place on June 30, July 2, and July 6, related to Plaintiff's attendance and overall performance.  (See, e.g., Doc. No. 19-32, p. 3–4; Doc. No. 19-4, p. 39; Doc. No. 19-3, p. 63–64).  Based on these conversations, on or about July 10, management decided to terminate Plaintiff.  (Doc. No. 19-32, p. 12–15).

On July 13, Edwards and Smith met with Plaintiff and terminated his employment.  (Doc. No. 19-2, p. 121).  They explained that Plaintiff was being terminated because of the condition of The Vue, Plaintiff's delay in completing work orders, his availability and attendance, and his leadership of his team.  (Doc. No. 19-39, p. 3, 7; Doc. No. 19-2, p. 128–30).  Following the termination meeting, NWR collected Plaintiff's keys to The Vue's common areas. (Doc. No. 19-

2, p. 142).  While Plaintiff retained the keys to his apartment, he had to contact the front desk in order to access it; his requests were never denied.  (Id.)  Plaintiff's lease established that the employee discount would end on either the day of his termination or final day of work, and that the terminated employee would have ten days to vacate the leased apartment, through July 23. (Doc. No. 19-23, p. 3, 12, 32).  However, Plaintiff contacted management on July 14 to request thirty days to vacate in light of the COVID pandemic and his roommate's newborn baby.  (Doc. No. 26, p. 4).  The following day, Brown responded to Plaintiff's request but said that after speaking with David Ravin, Cruz, and others, they could not accommodate his request because he was not living in the apartment—only his roommate and her child were living there at that time—The Vue would "remain consistent with [its] policy" of allowing only ten days to move out, and could not make an exception for a roommate.  (Doc. No. 19-33, p. 39; Doc. No. 26, p. 4).

On July 20, Owens informed Brown that he would be able to vacate his apartment by the deadline, but that he was concerned that his roommate would be unable to do so.  (Doc. No. 19-33, p. 37).  And on July 27, four days after the deadline passed, Owens informed Brown that he would be "completely out come this weekend."  (Id. at 36).  At that time, Brown informed Plaintiff that he was still able to enter his apartment to remove his belongings and explained the eviction process, urging Plaintiff to ensure he and his roommate were completely moved out of the apartment at The Vue to avoid reaching the final stages of the eviction proceedings.  (Id.).  The unit was vacated on August 5.  (Id. at 2).  Plaintiff, Brown, and other management members communicated through late September to discuss items Plaintiff alleges he left in his apartment and elsewhere on the property.  (Id. at 20).

6

On July 27, 2021, Plaintiff filed his Complaint against Defendant Northwood Ravin, (Doc. No. 1). Plaintiff then filed an Amended Complaint, adding Defendant NWR as a party to this matter. (Doc. Nos. 15–17). In his Amended Complaint, Plaintiff alleges eight claims for relief:

(1) Interference and retaliation in violation of the Family Medical Leave Act ("**FMLA**"), 29 U.S.C. § 2601, *et seq.*
(2) Interference and retaliation in violation of the Families First Coronavirus Response Act ("**FFCRA**"), Pub. L. No. 116-127, § 5104, 134 Stat. 178, 196–97 (2020);
(3) Disability discrimination and retaliation in violation of Title I of the Americans with Disabilities Act ("**ADA**") and the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12111, *et seq.* ("**ADAAA**");
(4) Wrongful discharge in violation of public policy under N.C. Gen. Stat. § 143-422.1, *et seq.*;
(5) Wrongful eviction in violation of public policy under N.C. Gen. Stat. § 42-25.6, *et seq.*;
(6) Conversion of Plaintiff's property;
(7) Intentional infliction of emotional distress; and
(8) Unfair and Deceptive Trade Practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*

(Doc. No. 17). Defendants moved for summary judgment on September 1, 2022. (Doc. Nos. 19, 20). Plaintiff filed his Response in Opposition to Defendants' Motion for Summary Judgment on September 29, (Doc. No. 27), and Defendants filed their Reply on October 12, (Doc. No. 30). Accordingly, Defendants' Motion is ripe for ruling. For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment.

## II.     STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248. Also, the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. Id. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. Id. at 249-50. In the end, the

8

question posed by a summary judgment motion is whether the evidence as applied to the governing

legal rules "is so one-sided that one party must prevail as a matter of law." Id. at 252.

### III.    ANALYSIS

#### A.    FMLA Claims

The Family and Medical Leave Act ("**FMLA**") makes it unlawful for an employer to

"interfere with, restrain, or deny the exercise of . . . any right under [the FMLA]" or to "discharge

or . . . discriminate against any individual for opposing any practice made unlawful by [the

FMLA]." 29 U.S.C. § 2615(a). In his Amended Complaint, Plaintiff asserts two separate claims

under the FMLA: (1) interference, and (2) retaliation. (Doc. No. 17, p. 7). Accordingly, the Court

will evaluate the merits of Plaintiff's FMLA claims under both theories.

#### 1.    Interference Claim

The FMLA prohibits employers from interfering with employees' ability to exercise  a

number of substantive rights protected by the FMLA, including the right to take "12 workweeks

of leave during any 12-month period" for a variety of medical and/or family reasons. 29 U.S.C.

§ 2612(a)(1); § 2615(a). To establish an FMLA interference claim, the employee "must

demonstrate that (1) he is entitled to an FMLA benefit; (2) his employer interfered with the

provision of that benefit; and (3) that the interference caused harm." Adams v. Anne Arundel

Cnty. Pub. Schs., 789 F.3d 422, 427 (4th Cir. 2015) (citing Ragsdale v. Wolverine World Wide,

Inc., 535 U.S. 81, 89 (2002) (internal citations omitted)).

To satisfy the first requirement, an employee is only entitled to an FMLA benefit if he is

taking "FMLA-qualifying leave" and provides adequate notice to the employer of the qualifying

leave. See Rhoads v. F.D.I.C., 257 F.3d 373, 382–83 (4th Cir. 2001) (outlining an employee's

9

FMLA obligations); <u>Rodriguez v. Smithfield Packing Co.</u>, 545 F. Supp. 2d 508, 515–16 (D. Md. 2008) ("The core requirements for triggering an employer's obligations [under the FMLA] are a *serious health condition* and *adequate communication*, meaning a timely communication sufficient to put an employer on notice that the protections of the Act may apply." (emphasis in original)); <u>Brushwood v. Wachovia Bank, N.A.</u>, 520 F. App'x 154, 157 (4th Cir. 2013) (quotations omitted). While the employee "need not expressly assert rights under the FMLA," in providing the employer with adequate notice, the employee must provide "at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." <u>Rhoads</u>, 257 F.3d at 382–83 (<u>quoting</u> 29 C.F.R. § 825.302(c)). Under the second requirement, FMLA "interference" includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave [or] manipulation by a covered employer to avoid responsibilities under [the] FMLA." 29 C.F.R. § 825.220(b).

Plaintiff alleges Defendants interfered with his rights in two ways: (1) by failing to provide him with notice of his FMLA rights, and (2) by terminating him for requesting FMLA leave. Neither party disputes, and so the Court assumes, that Plaintiff was eligible for FMLA leave due to his daughter Lucy's ongoing medical issues. 29 U.S.C. § 2612(a)(1)(C) (stating eligible employees are entitled to FMLA leave "to care for the . . . daughter . . . of the employee, if such . . . daughter . . . has a serious health condition."). Thus, Plaintiff must demonstrate first that Defendants' actions constituted interference, and then that such interference caused him harm.

    a.   <u>Defendants' Alleged Notification Violation</u>

The FMLA requires that covered employers provide employees with both general notice and eligibility notice of their rights under the FMLA, and failure to do so may constitute an

10

actionable FMLA interference claim where the employee is prejudiced such that he is "unable to exercise [the right to FMLA leave] in a meaningful way." 29 C.F.R. § 825.300(a)–(b), (e); Lupyan v. Corinthian Colls. Inc., 761 F.3d 314, 318–19 (3d Cir. 2014); Vannoy v. Federal Reserve Bank of Richmond, 827 F.3d 296, 301–02 (4th Cir. 2016). "Prejudice exists where an employee loses compensation or benefits 'by reason of the violation,'; sustains other monetary losses 'as a direct result of the violation,'; or suffers some loss in employment status remediable through 'appropriate' equitable relief." Reed, 241 F. App'x at 924 (internal citations omitted).

The eligibility notice requirement is triggered either when an employee requests leave under the FMLA, or when the employer "acquires knowledge that an employee's leave may be for an FMLA-qualifying reason." Id. § 825.300(b)(1). Once either occurs, the employer "must notify the employee of [his] eligibility to take FLMA leave [and his rights and responsibilities under the FMLA] within five business days." Id. § 825.300(b)(1). This notice must indicate whether the employee is eligible for FMLA-qualifying leave, and it may be oral or in writing. Id. § 825.300(b)(2). Employers, in providing eligibility notice, may—but are not required to—use the optional Form WH-381 (Notice of Eligibility and Rights and Responsibility). Id.

Here, Plaintiff alleges Defendants failed to provide him with the requisite eligibility notice concerning his FMLA rights and responsibilities. Defendants move for summary judgment on this claim, arguing that notwithstanding their failure to provide Plaintiff with the optional WH-381 form, Plaintiff did receive proper notice of his FMLA rights. Defendants further contend that even if Plaintiff can establish they violated the FMLA eligibility notice requirement, he is unable to show he was prejudiced as a result. However, viewed in the light most favorable to Plaintiff, the Court assumes that Defendants did in fact fail to provide Plaintiff with the requisite FMLA

11

eligibility notice, and that "such failure constitutes actionable interference." Reed v. Buckeye Fire Equip., 241 F. App'x 917, 924–26 (4th Cir. 2007). Thus, the Court must determine whether Plaintiff has provided sufficient evidence of prejudice.

Plaintiff appears to contend he was prejudiced by Defendants' notice violation in two ways: (1) it prevented him from taking FMLA leave, and (2) he was forced to deplete his paid time off ("**PTO**") to care for his daughter.[2] In response, Defendants allege neither argument sufficiently demonstrates prejudice because Defendants never prevented him from taking time off to care for his daughter, and he would have had to exhaust his PTO anyways, regardless of whether he was on FMLA leave or not. Even viewing the evidence in the light most favorable to Plaintiff, the Court agrees with Defendants that their alleged notice violation did not prejudice Plaintiff.

Taking Plaintiff's contention that Defendants' notice violation prevented him from taking FMLA leave as true, this alone fails to constitute prejudice because Defendants, by Plaintiff's own admission, never prevented him from taking time off to care for his daughter. "Prejudice may be gleaned from evidence that had the plaintiff received the required (but omitted) information regarding his FMLA rights, he would have structured his leave differently." Vannoy, 827 F.3d at 302 (citing Lupyan, 761 F.3d at 324 (holding prejudice requires demonstrating that had the plaintiff "been properly informed of her FMLA rights, she could have structured her leave differently."); Downey v. Strain, 510 F.3d 534, 537 (5th Cir. 2007) (finding prejudice where the employee would have scheduled surgery for a different time so as not to exceed her FMLA leave allowance); Dorsey v. Jacobson Holman, PLLC, 476 F. App'x. 861, 862 (D.C. Cir. 2012) (holding

---

[2] Plaintiff also alleges prejudice in that he would not have been terminated had Defendants granted him FMLA leave. The Court will address Plaintiff's termination theory separately in the following section.

the plaintiff failed to show prejudice where she "never returned to work" and "provides no record evidence whatsoever that she could have structured her leave differently.")

Here, however, Plaintiff testified that Defendants never prevented him from taking time off to care for his daughter. (Doc. No. 19-2, p. 89, 120). In fact, Plaintiff acknowledged that the parties' agreement for 2019 and 2020 was that Defendants would allow Plaintiff to take off as much time as he needed to care for his daughter, as long as he "g[ot] stuff dune at the property, . . . [was] able to perform [his] normal duties . . . and exceed[ed] expectations." (Id. at 96). Thus, even if Defendants had notified Plaintiff of his FMLA rights, Plaintiff has not shown that had he been informed of his FMLA rights, he would have structured his time differently to preserve employment. See Rosetti v. Rose Grp., Inc., 2018 U.S. Dist. LEXIS 200263, at *3 (M.D. Fla. Nov. 27, 2018) (collecting cases where the court found sufficient prejudice). Nor has Plaintiff shown that Defendants' alleged notice violation discouraged him from taking FMLA leave. To the contrary, in Plaintiff's own communications with both Cruz and Brown regarding FMLA leave, he expressed multiple times that he did not want to file for FMLA leave. (Doc. No. 19-25, p. 1, 4–5).[3] This supports Brown's deposition testimony of the same facts. (Doc. No. 19-7, p. 6). Given his desire to avoid filing for FMLA leave and the flexibility he did receive, even with notice of his FMLA rights, Plaintiff fails to show that he would have structured his leave differently. Therefore, the Court finds that Plaintiff's argument that he was prejudiced because he was prevented from taking FMLA leave fails.

---

[3] Plaintiff emailed Cruz on November 28, 2019, stating: "Do you think I should file for FMLA for the remainder of this year or will I be fine pushing through until 2020 without it being that we only have a month. I'm find with not getting paid for days off I just do not want to get in trouble." (Doc. No. 19-25, p. 1). Then, on December 3, 2019, Plaintiff emailed Brown: "I don't want to file for FMLA but I also don't want to get into any trouble if I need more time off." (Id. at 4–5).

13

Next, Plaintiff's assertion that he was prejudiced in that he had to deplete his PTO to care for his daughter since Defendants did not give him FMLA leave when he inquired about it similarly fails to demonstrate prejudice. As Defendants point out, the Employee Handbook—which Plaintiff signed an acknowledgement stating that he had received and read on January 23, 2018, (Doc. No. 19-21)—states: "Associates are required on commencing FMLA leave to simultaneously take any paid leave for which they are eligible, including sick leave, vacation leave, or personal leave. Once paid leave is exhausted, the associate goes on unpaid leave for the remainder of the leave period." (Doc. No. 19-20, p. 29); see also 29 U.S.C. § 2612(d)(A) ("an employer may require the employee[] to substitute any of the accrued paid vacation leave, personal leave, or medical or sick leave of the employee for [FMLA] leave."). Thus, Plaintiff's argument that he was prejudiced because he was forced to exhaust his PTO fails.

b. Plaintiff's Termination

Plaintiff next argues that he was prejudiced because had he taken intermittent FMLA leave, he would not have been terminated. Specifically, "his team and management would have been apprised that he was not at work due to FMLA protected leave, rather than just taking days off, showing up late or leaving early." (Doc. No. 26, p. 9). Further, Plaintiff asserts that management and his team "would also have understood why some tasks might be taking longer to accomplish and they would have presumably made arrangements to fill in the gaps left by his protected absences, rather than just assume he was not doing his job." (Id.). Defendants, on the other hand, contend that Plaintiff cannot show prejudice because his termination was due to his poor performance, not just because of his attendance issues related to FMLA-qualifying leave.

14

While an employee's termination can constitute a cognizable FMLA interference claim, "being on FMLA leave does not provide an employee any greater rights than he or she would have had without taking leave." Mercer v. Arc of Prince Georges Cnty., Inc., 532 F. App'x. 392, 396–97 (4th Cir. 2013); Vannoy, 827 F.3d at 304–05 ("The FMLA does not prevent an employer from terminating an employee for poor performance, misconduct, or insubordinate behavior.") Instead, employers have "discretion to discipline or terminate the employment of an at-will employee for poor performance regardless of whether the employer's reason for terminating the employment was discovered while the employee is taking FMLA leave." Mercer, 532 F. App'x. at 398.

Here, Defendants have provided substantial evidence indicating problems with Plaintiff's attendance and overall job performance existed well before, and long after, Plaintiff inquired about FMLA leave. (Doc. No. 19-11, p. 1–3; Doc. No. 19-24).[4] Plaintiff testified that he went over his Performance Evaluation with Cruz on November 7, and that he remembered discussing Defendants' concerns that improvement was needed related to move-out inspections, his average time for completing work orders, and his attendance and punctuality. (Doc. No. 19-2, p. 62–69). Further, the transcript of the termination meeting demonstrates that the principal reasons Plaintiff was terminated were the declining appearance of The Vue, his availability and timekeeping, his delay in completing work orders, his inability to complete his job responsibilities, and his lack of leadership. (Doc. No. 19-39, p. 1–8). Plaintiff does not introduce any evidence disputing

---

[4] For example, communications between Cameron and Plaintiff from October 7, 2019, and Plaintiff's October 17, 2019, Performance Evaluation both demonstrate Plaintiff was aware of Defendants' concerns regarding his attendance, frequent tardiness, inconsistency with clocking in and out properly, and delay in resolving work orders. (Doc. No. 19-11, p. 1–3; Doc. No. 19-24). Notably, Cameron's email indicates Plaintiff failed to properly clock in or out thirty-six (36) times between August 12 and October 7, 2019, (Doc. No. 19-11, p. 3), and Plaintiff's 2019 Performance Evaluation reflected that he needed to improve the average completion time for work orders, his attendance and punctuality, and his use of the time sheet system. (Doc. No. 19-24).

Defendants' allegations.  Instead, Plaintiff merely asserts that had he taken FMLA leave, his team and management would have understood why he was frequently absent or unavailable, his delay in completing his job responsibilities would have been justified and permissible, Defendants might have made arrangements to ensure other employees were taking care of what he was not accomplishing, and ultimately that he would not have been terminated.  However, these "what ifs" are unpersuasive.  Plaintiff's own testimony demonstrates the holes in these allegations: Plaintiff stated that "communication is important," and when he knew he was going to be late for work, he "was often in contact with either [his] team or" Cameron, his property manager, as he knew he "had an obligation as a manager to be fully in communication with" management.  (Doc. No. 19-2, p. 52, 91–92).  Further, rather than providing specific evidence showing that he did not have attendance or punctuality issues prior to his daughter's illness, or refuting any of Defendants' other asserted reasons for terminating his employment to show that he was instead terminated because he had to care for a sick child, Plaintiff merely concludes that "there is clearly an issue of fact as to whether Defendants terminated Plaintiff due to attendance issues," and that "there is ample evidence that Plaintiff suffered prejudice as a consequence of Defendants' FMLA violations." (Doc. No. 26, p. 8–9).  Thus, "[n]one of [Plaintiff's] contentions create a genuine issue of material fact as to the reason why [Defendants] terminated [his] employment."  Mercer, 532 F. App'x. at 397.  Defendants have provided ample evidence demonstrating Plaintiff's decreasing performance throughout his employment, and Plaintiff has not presented evidence that would permit a reasonable jury to find otherwise.  Though Plaintiff is correct that terminating an employee for requesting future FMLA leave can constitute impermissible interference,  he does not introduce

16

any evidence supporting his own contentions, and his "subjective view of [his] job performance is not sufficient to survive summary judgment." Id.

Therefore, Plaintiff has failed to produce sufficient evidence to demonstrate that, under either his notice violation or termination theories, Defendants' alleged interference with his exercise of his FMLA rights caused him harm. Accordingly, the Court holds that Defendants are entitled to summary judgment on Plaintiff's FMLA interference claim.

### 2. Retaliation Claim

The FMLA also prohibits employers from "discharge[ing] or in any other manner discriminat[ing] against" an employee in retaliation for exercising his FMLA rights. 29 U.S.C. § 2615(a)(2). "Retaliation claims brought under the FMLA are analogous to those brought under Title VII." Adams, 789 F. 3d at 429 (citing Laing v. Fed. Express Corp., 703 F.3d 713, 717 (4th Cir. 2013)). Thus, where a plaintiff is unable to offer direct and/or indirect evidence of discrimination, they must prove three elements to establish a *prima facie* case of retaliation under the FMLA: "(1) [he] engaged in protected activity; (2) [his] employer took an adverse employment action against [him]; and (3) there was a causal link between the two events." Id. (internal quotations omitted). Then, if the defendant can provide a nondiscriminatory reason for the adverse employment action, the plaintiff has an opportunity to demonstrate that the employer's proffered reason is a pretext. Id.

Plaintiff alleges Defendants terminated his employment in retaliation for taking intermittent leave to care for his daughter. Defendants, in response, move for summary judgment for four reasons: (1) Plaintiff cannot prove causation, (2) Plaintiff has not provided any evidence of retaliatory animus by Defendants, (3) any protected activity was too far removed from Plaintiff's

17

termination, and (4) Defendants' stated reasons for Plaintiff's termination constitute legitimate, non-retaliatory reasons for discharge.

However, the Court need not even reach Defendants' arguments because, even assuming Plaintiff can make out a *prima facie* case of FMLA retaliation—taking as true his contentions that he engaged in protected FMLA activity when he took intermittent leave to care for his daughter, Defendants terminated him, and there was a causal link between those two events—his retaliation claim still fails. Defendants have proffered ample evidence demonstrating that they terminated Plaintiff's employment for the legitimate, non-retaliatory reasons discussed above. These include his overall job performance, the appearance of The Vue, his lack of leadership, and the resulting trust issues among his team members. Plaintiff does not introduce evidence to dispute Defendants' asserted reasons; nor does Plaintiff introduce any evidence demonstrating Defendants' proffered justifications for his termination were instead a pretext for FMLA retaliation.[5] While Plaintiff's Amended Complaint alleges "Defendants' proffered reason for termination, that Plaintiff's lack of availability and the property's substandard appearance, was pretextual, and was in retaliation for Plaintiff exercising protected rights," (Doc. No. 17, p. 6), Plaintiff fails to present evidence supporting this contention. Thus, even viewing the record in the light most favorable to Plaintiff, other than this conclusory allegation Plaintiff has not produced any evidence from which a reasonable jury could find Defendants' stated reasons for his termination were pretext for retaliation. "[A] plaintiff's own assertions of discrimination in and of themselves are insufficient

---

[5] Instead, the record provides ample support that Defendants were empathetic and concerned for Plaintiff and his daughter, were not hostile, and readily gave him the flexibility he needed to care for her. (See, e.g., Doc. No. 19-2, p. 89; Doc. No. 19-25). Further, the Court notes that Plaintiff inquired about his FMLA rights approximately seven and a half months before he was terminated, which is not determinative but weighs against any inference of retaliation. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001); King v. Rumsfeld, 328 F.3d 145, 151 n.5 (4th Cir. 2003).

to counter substantial evidence of legitimate non-discriminatory reasons for a discharge." Vannoy, 827 F.3d at 304 (quoting Dockins v. Benchmark Commc'ns, 176 F.3d 745, 749 (4th Cir. 1999). Thus, in the absence of evidence demonstrating otherwise, and because the record supports Defendants' stated reasons for Plaintiff's termination, the Court finds that Plaintiff is unable to demonstrate that these reasons are pretexts for impermissible FMLA retaliation.

Therefore, Plaintiff's FMLA retaliation claim fails, and Defendants are entitled to summary judgment as to Plaintiff's FMLA claim under both the interference and retaliation theories.

## B. FFCRA Claims

The Families First Coronavirus Response Act ("**FFCRA**") provides:

> An employer shall provide to each employee . . . paid sick time to the extent that the employee is unable to work . . . due to a need for leave because:

(1) The employee is subject to a Federal, State, or local quarantine or isolation order related to COVID-19.
(2) The employee has been advised by a health care provider to self-quarantine due to concerns related to COVID-19.
(3) The employee is experiencing symptoms of COVID-19 and seeking a medical diagnosis. . . .

Pub. L. No. 116-127, § 5102, 134 Stat. 178, 195 (2020). Additionally, the FFCRA prohibits an employer from discharging, disciplining, or otherwise discriminating against employees who takes protected leave under the Act. Id. § 5104(1). As with his FMLA claim, Plaintiff asserts two separate claims under the FFCRA: (1) interference, and (2) retaliation. (Doc. No. 17, p. 8).

### 1. Interference

Plaintiff's Amended Complaint is silent as to how Defendants interfered with his FFCRA leave; Plaintiff does not dispute that he requested, and was granted, paid leave to self-quarantine from May 1 until May 12, 2020. However, based on his deposition testimony and the parties'

19

briefings on this issue, Plaintiff's apparent argument is that Defendants interfered with his FFCRA leave when they required him to perform some of his job responsibilities while he was on FFCRA leave. (Doc. No. 26, p. 11).[6] Defendants move for summary judgment on this claim because any work Plaintiff performed while on FFCRA leave was at best *de minimis*.

At the outset, the Court notes that the parties dispute whether an interference claim is even actionable under the FFCRA. The Fourth Circuit has not yet addressed this issue, and "the established caselaw on the FFCRA is scant." Mackie v. Coconut Joe's IOP LLC, No. 2:20-cv-02562-DNC, 2021 WL 4993538, at *8 (D.S.C. Oct. 27, 2021). However, even if the FFCRA did establish a cognizable interference claim, Plaintiff has failed to produce evidence to support one.

The undisputed evidence demonstrates that Plaintiff requested, and received, FFCRA leave to self-quarantine, and that he was immediately restored to his position as Service Manager upon his return. Plaintiff contends that the analysis for an interference claim under FFCRA should be the same as the analysis under the FMLA, but even under this standard, Plaintiff is unable to demonstrate that Defendants interfered with his FFCRA leave by asking him to complete minor aspects of his job while he was out and that this interference caused him harm. See Adams, 789 F.3d at 427.

Plaintiff does not introduce evidence showing that Defendants either refused to authorize his FFCRA leave or discouraged him from taking it, see 29 C.F.R. § 825.220(b), nor does Plaintiff contend that he was unable to exercise his FFCRA leave "in a meaningful way." See Lupyan, 761

---

[6] Additionally, in Plaintiff's Response to Defendants' Motion for Summary Judgment, Plaintiff states the conclusion that "an interference claim can be based on other conduct by the employer, such as termination for requesting and/or taking FFCRA leave." (Doc. No. 26, p. 11). However, Plaintiff provides neither explanation nor evidence demonstrating specific conduct on the part of Defendants to which that statement refers. As such, this Court declines to do so for him.

F.3d at 318–19; 20 C.F.R. § 825.300(a)–(b), (e). Rather, the record—including Plaintiff's deposition and communications between Plaintiff and other employees of The Vue—demonstrates that while he was on FFCRA leave, Plaintiff responded to a handful of text messages, completed tasks such as "find[ing] out information" for a supervisor, and other similar responsibilities during the two weeks Plaintiff was self-quarantining. Plaintiff testified during his deposition that the work he completed while on leave is "clearly documented . . . [in the] text messages between" Plaintiff and Cameron. (Doc. No. 19-2, p. 110–11) (See also Doc. No. 19-34). The Court agrees with Defendants that these messages merely reflect *de minimis* routine communications that fail to "cross the line into interference." See Smith-Schrenk v. Genon Energy Servs., L.L.C., Civil Action No. H-13-2902, 2015 WL 150727, at *9 (S.D. Tex. Jan. 12, 2015).

Thus, even assuming the FFCRA does establish a cognizable interference claim, Plaintiff has not produced evidence sufficient to demonstrate Defendants' impermissible interference—he took two weeks of paid leave to quarantine, and though he did communicate with management and complete assorted routine job responsibilities while on leave, these *de minimis* actions do not rise to the level of interference. Therefore, Defendants are entitled to judgment as a matter of law on Plaintiff's FFCRA interference claim.

### 2. Retaliation

Plaintiff next contends that by terminating his employment, Defendants retaliated against him in violation of FFCRA. The Act expressly provides that it is "unlawful for any employer to discharge, discipline, or in any other manner discriminate against any other employee" who takes protected FFCRA leave. Pub. L. No. 116-127, § 5104, 134 Stat. 178, 195 (2020). Because the Act's enforcement mechanism establishes that an employer's willful violation of the FFCRA is

21

considered a violation of section 15(a)(3) of the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3), and therefore subject to the penalties provided by the FLSA, the Court will apply the FLSA approach to analyzing a claim for retaliation.  Pub. L. No. 116-127, § 5105, 134 Stat. 178, 195 (2020).  Thus, to prevail on such a claim, if a plaintiff is unable to offer direct and/or indirect evidence of retaliation, they must establish a *prima facie* case of retaliation by proving that: (1) he engaged in a protected activity; (2) his employer took an adverse employment action against him; and (3) there was a causal link between the two.  Perkins v. Int'l Paper Co., 936 F.3d 196, 213 (4th Cir. 2019); Mackie, 2021 WL 4992528, at *8.  If the plaintiff succeeds in doing so, the burden then shifts to the defendant to articulate a non-retaliatory reason for its action sufficient to rebut the presumption of retaliation.  Id.  The plaintiff will then bear the ultimate burden of proving the defendant's proffered reason is a pretext for unlawful retaliation.  Id.

Here, the Court finds that Plaintiff has forecast evidence that sufficiently raises a genuine dispute as to material fact.  As stated above, the parties do not dispute that Plaintiff took protected FFCRA leave from May 1 through May 12, 2020.  As to the second element for a *prima facie* retaliation claim, the parties also do not dispute that Defendants terminated Plaintiff's employment approximately three months after Plaintiff was reinstated to his position as Service Manager following his FFCRA leave.  However, the parties here do dispute whether there was a causal link between the two.  While Defendants' evidence tends to demonstrate that, as explained above, there were multiple longstanding, legitimate, non-retaliatory reasons for Plaintiff's termination.  Plaintiff responds that given the close temporal proximity between his FFCRA leave and his termination, and because he was allegedly treated differently upon his return, Defendants' stated reasons are mere pretext.  Thus, the question becomes one of credibility better suited for a jury.

22

Therefore, the Court holds that Defendant is not entitled to summary judgment on Plaintiff's FFCRA retaliation claim.

## C.    ADA Claim

The Americans with Disabilities Act ("**ADA**") prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The ADA further prohibits employers from retaliating against an employee who has engaged in a protected ADA activity.  Id. § 12203(a).  As with the FMLA and FCCRA claims, Plaintiff alleges two separate claims under the ADA: (1) disability discrimination, and (2) retaliation.

### 1.    Discrimination

To establish a *prima facie* ADA discrimination claim, a plaintiff must "provide evidence sufficient to demonstrate that (1) he 'was a qualified individual with a disability'; (2) he was discharged; (3) he 'was fulfilling his employer's legitimate expectations at the time of discharge'; and (4) 'the circumstances of his discharge raise a reasonable inference of unlawful discrimination.'"  Reynolds v. Am. Nat. Red Cross, 701 F.3d 143, 150 (4th Cir. 2012) (quoting Rohan v. Networks Presentations, LLC, 375 F.3d 266, 277 n.9 (4th Cir. 2004)).  If the plaintiff successfully does so, the defendant will have the burden of producing evidence of a legitimate, non-discriminatory reason for the termination.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Finally, the burden will shift back to the plaintiff to demonstrate that the defendant's justification was instead pretext for unlawful discrimination.  Id. at 804.

Here, Plaintiff alleges that in the two months after he returned from taking FFCRA leave, he faced discrimination for his actual or perceived disability in that Defendants treated him differently, questioned his passion for his job, subjected him to increased scrutiny, informed him that his team lost trust in his leadership, and ultimately terminated him. Defendants move for summary judgment because Plaintiff does not have a disability, and by his own admissions he was not regarded as having a perceived disability. Because Plaintiff is unable to satisfy the first requirement of a *prima facie* ADA discrimination claim, the Court agrees with Defendants.

An ADA discrimination claim requires that the employee demonstrate that at the time of his discharge, he was a qualified individual with a disability—that he was within the ADA's protected class. Rohan, 375 F.3d at 272. An individual is "disabled" under the ADA if he "(A) [has] a physical or mental impairment that substantially limits one or more of the major life activities of such individual; . . . or (C) [has been] regarded as having such an impairment." 42 U.S.C.§ 12102(2). Plaintiff alleges he was perceived as having a disability as demonstrated by the staff and management at The Vue's fear of contracting COVID and his different treatment upon his return from FFCRA leave.

However, even viewing this allegation in the light most favorable to Plaintiff and assuming he has successfully demonstrated he was a qualified individual with a disability following his COVID leave, his discrimination claim fails for two reasons. First, Plaintiff's own deposition testimony contradicts his argument that he was fulfilling Defendants' expectations when he was discharged. As explained above, Defendants have introduced an array of evidence demonstrating that their concerns related to Plaintiff's performance began well before he took FFCRA leave. Plaintiff contends he was treated differently in that he faced increased scrutiny only after he was

reinstated to his position. However, much of Defendants "scrutiny" stemmed from attendance and timekeeping issues, the delay in resolving work orders, and The Vue's declining appearance, and these concerns were raised as early as October 2019. (See Doc. No. 19-24; Doc. No. 19-2, p. 62–69). Further, the February 2, 2020, Fire Inspection Report outlines a host of fire code violations and safety concerns, (Doc. No. 19-31), which Plaintiff admits were his responsibility, (Doc. No. 19-2, p. 27–28). Thus, even assuming Plaintiff had an ADA disability, contrary to Plaintiff's allegation that Defendants only scrutinized him because of his perceived COVID disability, Defendants have provided ample evidence showing that Plaintiff was failing to meet expectations long before his FFCRA leave, and that any scrutiny Plaintiff faced predated his disability.

Second, for many of the same reasons Plaintiff is unable to demonstrate that the circumstances of his discharge raise any inference of discrimination. When asked whether Defendants' communications ever led him to believe they thought he had a medical condition that was impacting his ability to fulfill his job obligations, Plaintiff testified that they did when they approved him for COVID leave, (Doc. No. 19-2, p. 119), but this act demonstrates compliance with the FFCRA rather than improper discrimination. Plaintiff further testified that he does not have a disability, (id. at 16), that he was unsure whether taking FFCRA COVID leave was even considered a disability, (id. at 17), and that his only basis for believing he faced ADA discrimination was that he was treated differently when his leave ended, (id. at 113–14, 119). Though Plaintiff's Amended Complaint states the impermissible conduct that constitutes ADA discrimination, (Doc. No. 17, p. 9–10), Plaintiff does not point to any evidence demonstrating that any of Defendants' conduct leading to his termination falls within those prohibitions. 42 U.S.C. § 12112(b). Instead, his testimony demonstrates that Defendants made reasonable

25

accommodations by providing him with paid leave, and the record, as discussed above, demonstrates that any increased scrutiny he believed he faced upon his return from COVID leave was instead well documented long before his perceived disability occurred. Thus, Plaintiff has failed to demonstrate two of the four required elements of a *prima facie* ADA discrimination claim.

Accordingly, this Court holds that Defendants are entitled to summary judgment as to Plaintiff's ADA discrimination claim.

### 2. Retaliation

Plaintiff's second theory of his ADA claim is that Defendants impermissibly retaliated against him because of his perceived COVID-related disability by (1) denying him reasonable accommodations, (2) subjecting him to increased scrutiny, (3) terminating his employment, and (4) subjecting him to discipline.

The ADA establishes that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this chapter." 42 U.S.C. § 12203(a). Thus, a plaintiff asserting an ADA retaliation claim must "either offer sufficient direct and indirect evidence of retaliation[] or proceed under a burden-shifting method." Rhoads, 257 F.3d 373, 391 (4th Cir. 2001) (citation omitted). Under the first method, a plaintiff will only survive summary judgment if he "produce[s] direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." Id. (citation and quotation omitted). Under the burden-shifting method, a plaintiff must first establish a *prima facie* case of retaliation by showing that "(1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link

exists between the protected conduct and the adverse action." <u>Reynolds</u>, 701 F.3d at 154 (citation omitted). The burden will then shift to the employer to show its legitimate, non-retaliatory reasons for its actions. <u>Rhoads</u>, 257 F.3d at 392. Finally, the plaintiff must then establish that those reasons are mere pretext for impermissible retaliation. <u>Id.</u>

Plaintiff has offered neither direct nor indirect evidence of Defendants' stated purpose to retaliate against him. As such, to prevail on this claim, Plaintiff must satisfy the burden-shifting framework. At the outset, the Court notes that while neither party addressed this issue in their briefings, Plaintiff did not allege he engaged in any of the conduct protected by the ADA; he did not allege that he opposed any act made unlawful by the ADA, nor did he allege he participated in any way in an investigation, proceeding, or hearing protected under the ADA. Instead, Plaintiff alleges that by (1) denying him reasonable accommodations, (2) subjecting him to increased scrutiny, (3) terminating his employment, and (4) subjecting him to discipline, Defendants retaliated against him for his perceived disability. Thus, Plaintiff has failed to introduce evidence specifying any instances of conduct protected by the ADA aside from taking FFCRA leave, which the Court finds is more appropriately handled under the FFCRA as outlined above.

Further, even if Plaintiff did allege that he engaged in protected conduct and was terminated as a result, for the same reasons outlined regarding Plaintiff's ADA discrimination claim, the Court finds that Plaintiff's retaliation allegations are without merit. Plaintiff requested, received, and took, paid leave as required by FFCRA, and he fails to point to any other evidence demonstrating Defendants denied him any accommodations related to his alleged perceived disability. Additionally, Defendants have produced sufficient evidence demonstrating that he was subjected to scrutiny and discipline due to longstanding concerns related to Plaintiff's performance that

predated his alleged protected activity. Finally, the transcript of the termination meeting, Plaintiff's 2019 Performance Evaluation, the 2020 Fire Code Inspection, and Defendants' communications with—and about—Plaintiff's termination all demonstrate that he was terminated not because he engaged in any protected ADA conduct, but because he was failing to meet the requirements of his role as Service Manager. (See, e.g., Doc. No. 19-2; Doc. No. 19-19; Doc. No. 19-31; Doc. No. 19-32; Doc. No. 19-35; Doc. No. 19-39).

Therefore, the Court holds that Defendants are entitled to judgment as a matter of law on Plaintiff's ADA retaliation claim.

## D.  Wrongful Discharge Claim

Plaintiff's fourth claim for relief alleges that he was wrongfully discharged in violation of public policy as set forth in N.C.G.S. § 143-422.1. Defendants move for summary judgment on this claim under the same reasons they cited for Plaintiff's FMLA and FFCRA claims.

North Carolina's Equal Employment Practices Act ("**NCEEPA**") establishes that it "is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex, or handicap." N.C. GEN. STAT. § 143-422.2(a). A plaintiff asserting a wrongful discharge claim under NCEEPA bears the same evidentiary burden as required for an ADA claim. See N.C. Dep't of Corr. v. Gibson, 301 S.E.2d 78, 84 (N.C. 1983) (applying the "evidentiary standards and principles of law" that Title VII establishes in analyzing discrimination claims under the NCEEPA); see also Perdue v. Sanofi-Aventis, U.S., LLC, No. 19-2094, 2021 WL 2324553, at *6 n.5 (4th Cir. June 8, 2021). For the reasons outlined above, Plaintiff has failed to satisfy his evidentiary burden for his ADA claims. Therefore, Plaintiff's

28

wrongful discrimination claim under North Carolina law also fails, and Defendants are entitled to summary judgment as to this claim.

**E.      Wrongful Eviction Claim**

In his fifth claim for relief, Plaintiff alleges Defendants wrongfully evicted him from his apartment at The Vue, in violation of North Carolina law as set forth in N.C. Gen. Stat. § 42-25.6, *et seq.*  In moving for summary judgment, Defendants contend Plaintiff was not evicted and that instead, Plaintiff's "own words disprove any eviction claim."  (Doc. No. 20, p. 17).

"It is the public policy of the State of North Carolina, in order to maintain the public peace, that a residential tenant shall be evicted, dispossessed or otherwise constructively or actually removed from his dwelling unit only in accordance with the [summary ejectment] procedure prescribed in Article 3 . . . of this Chapter."  N.C. GEN. STAT. § 42-25.6.  North Carolina law further provides that "distress and distraint are prohibited and that landlords of residential rental property shall have rights concerning the personal property of their residential tenants only in accordance with" other provisions of North Carolina's landlord/tenant law.  N.C. GEN. STAT. § 42-25.7.

Here, Plaintiff alleges that because he was a tenant of Defendants' property, The Vue, when he was terminated from his employment with The Vue, he could only be evicted in accordance with North Carolina's statutory scheme.  The Court finds that Plaintiff has presented evidence sufficient to create a genuine dispute of material fact on this issue.  Defendants have presented evidence that shows the Employee Lease Addendum clearly states their policy that following an employee's termination, they will be required to vacate their apartment within ten days, (Doc. No. 19-23, p. 2–3, 12, 32–34), and Plaintiff testified that when he signed his lease in 2018 and when he was terminated in 2020, he was informed of—and understood—the policy outlined in the

29

Employee Apartment Discount Platform.  (Doc. No. 19-2, p. 56–57).  However, Plaintiff has presented evidence that Defendants informed him that they were starting eviction proceedings against him, leading him to believe he had more time to move out of his apartment.  (Doc. No. 19-33, p. 25, 36).  Additionally, Plaintiff appears to assert a constructive eviction claim, in that he alleges that Defendants denied his request for additional time in which to vacate his apartment, took his house keys from him at the conclusion of the termination meeting thereby limiting his access to his apartment, and failed to begin eviction proceedings against him after stating they would.  The Court finds Plaintiff has pointed to sufficient evidence to raise a genuine dispute as to material fact.  (Id.; Doc. No. 19-2; Doc. No. 31-1).  Defendants argue that Plaintiff was already mostly moved out of his apartment when he was terminated, and that although they took Plaintiff's keys to the common areas of The Vue at his termination meeting, he retained his key to his apartment and was never denied access to it.  Accordingly, Defendants are not entitled to summary judgment on Plaintiff's wrongful eviction claim under North Carolina law.

**F.      Conversion**

In his sixth claim for relief, Plaintiff alleges Defendants unlawfully, and without his authorization, converted Plaintiff's property from his apartment for their own use.  This is so, he contends, because Defendants failed to follow statutory eviction proceedings, and instead wrongly removed him—and his personal property—from his apartment following his termination, after which Defendants illegally removed and disposed of his personal property still on the premises.

"Conversion is well defined as an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights."  Peed v. Burleson's, Inc., 94 S.E.2d 351, 353 (N.C. 1956)

(internal quotation and citation omitted). Thus, a conversion claim requires two elements: "ownership in the plaintiff and wrongful possession or conversion by the defendant." Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC, 723 S.E.2d 744, 747 (N.C. 2012). As such, the "essence of conversion is not the acquisition of property by the wrongdoer, but the *wrongful deprivation* of it to the owner." Lake Mary Ltd. Part. V. Johnston, 551 S.E.2d 546, 552 (N.C. Ct. App. 2001) (emphasis added) (citation omitted). However, "[w]here there has been no wrongful taking or disposal of the goods, and the defendant has merely comes rightfully into possession and then refused to surrender them, demand and refusal are necessary to the existence of the tort." Hoch v. Young, 305 S.E.2d 201, 203 (N.C. Ct. App. 1983).

North Carolina law establishes certain rights, responsibilities, procedures, and remedies for the ejectment of residential tenants. N.C. GEN. STAT. § 42-25.6 to § 42-36.3. Under these provisions, conversion is an appropriate remedy for a landlord's improper removal of a tenant. Id. § 42-25.9. As such, determining whether Defendants converted Plaintiff's apartment and personal property relies on determining whether Plaintiff abandoned his personal property when he voluntarily vacated his apartment, as Defendants allege, or whether Plaintiff was instead wrongfully evicted in violation of North Carolina law. For the reasons stated above, a genuine dispute as to material fact exists regarding Plaintiff's wrongful eviction claim. Therefore, because Plaintiff's conversion claim depends on the outcome of Plaintiff's wrongful eviction claim, the Court holds that Defendants are not entitled to summary judgment on Plaintiff's conversion claim.

## G.     Intentional Infliction of Emotional Distress Claim

Plaintiff next alleges an intentional infliction of emotional distress ("**IIED**") claim stemming from his wrongful eviction. Defendants move for summary judgment first because

Plaintiff does not suffer from emotional distress caused by Defendants, and second because Defendants did not engage in extreme and outrageous conduct.

To succeed on an IIED claim, a plaintiff must demonstrate that the defendant intentionally or recklessly engaged in: "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress to another." Dickens v. Puryear, 302 N.C. 437, 452 (N.C. 1981); see also Jackson v. Kimmel, 992 F.2d 1318, 1324 (4th Cir. 1993) (citing Hogan v. Forsyth Country Club Co., 340 S.E.2d 116, 119 (N.C. Ct. App. 1986)). The alleged act must be "done with the intention of causing emotional distress or with reckless indifference to the likelihood that emotional distress may result." Norton v. Scotland Mem'l Hosp., Inc., 793 S.E.2d 703, 708 (N.C. Ct. App. 2016) (citation omitted). Thus, a "defendant is liable for [IIED] when he desires to inflict severe emotional distress or *knows such distress is certain, or substantially certain, to result from his conduct* or where he acts recklessly in deliberate disregard of a high degree of probability the emotional distress will follow, and the mental distress does in fact result." Norton, 793 S.E.2d at 708.

Under the first element, "[c]onduct is extreme and outrageous when it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Chidnese v. Chidnese, 708 S.E.2d 725, 738 (N.C. Ct. App. 2011) (citing Johnson v. Colonial Life & Accident Ins. Co., 618 S.E.2d 867, 872 (N.C. Ct. App. 2005)); Guthrie v. Conroy, 567 S.E.2d 403, 408–09 (N.C. Ct. App. 2002). Whether "conduct rises to the level of extreme and outrageous behavior is a question of law" to be determined by the court. Chidnese, 708 S.E.2d at 738. To that end, "[e]xtreme and

32

outrageous is a high bar; mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities are not enough." Johnson v. Bollinger, 356 S.E.2d 378, 382 (N.C. Ct. App. 1987).

Plaintiff contends the following conduct rises to the level of extreme and outrageous behavior: (1) Defendants wrongfully terminated Plaintiff; (2) Defendants unlawfully discriminated against Plaintiff; (3) Defendants unlawfully retaliated against Plaintiff; (4) Defendants wrongfully evicted him from his apartment. Plaintiff concedes that mere termination may be insufficient to rise to extreme and outrageous conduct as required for an IIED claim, but instead argues that together, these assertions heighten Defendants' behavior to extreme and outrageous.

Based on an in-depth review of the record, for the reasons already discussed in this Order, the Court finds Plaintiff's allegations related to wrongful termination and unlawful discrimination are without merit, as is Plaintiff's allegation regarding retaliation to the extent that it concerns the FMLA. However, because the Court found that a genuine dispute of material fact exists as to Plaintiff's FFCRA retaliation, wrongful eviction, and conversion claims, the Court holds that summary judgment is improper as to Plaintiff's IIED claim to the extent that it relies on those allegations. Further, Plaintiff has pointed to sufficient evidence to raise a genuine dispute as to material fact regarding whether these actions did cause him severe emotional distress. Plaintiff testified that he was treated for depression, and was prescribed medication, following the events related to his termination and alleged eviction. (Doc. No. 22-1, p. 24–28; Doc. No. 22-2). While Defendants argue that he was never diagnosed with severe emotional distress and that Plaintiff has failed to produce medical records to support his conclusion that Defendants' conduct caused his depression, based on the record before the Court, sufficient evidence exists that could lead a jury to return a verdict for either party.

Therefore, the Court holds that Defendants are not entitled to summary judgment on Plaintiff's IIED claim to the extent that it relies on Plaintiff's claims for FFCRA retaliation, wrongful eviction, and conversion.

## H.    Unfair and Deceptive Trade Practices Claim

Plaintiff, in his final claim for relief, alleges that Defendants' seizure and conversion of his personal property, in addition to their interference with his attempted removal of such property, constitutes unfair and deceptive trade practices under North Carolina law.  Defendants move for summary judgment on this claim on the grounds that Defendants' conduct does not rise to the level of "egregious, immoral, oppressive, unscrupulous, or substantially injurious" behavior required to support Plaintiff's claim.  (Doc. No. 20, p. 18).[7]

North Carolina's Unfair and Deceptive Trade Practices Act ("**UDTPA**") provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."  N.C. GEN. STAT. § 75-11(a).  In analyzing an UDTPA claim, the court "must first determine whether the act or practice falls within the purview of [the UDTPA]."  Sara Lee Corp. v. Carter, 519 S.E.2d 308, 311 (N.C. 1999).  To establish a *prima facie* claim under the UDTPA, a plaintiff must demonstrate: "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff."  Dalton v. Camp, 548 S.E.2d 704, 711 (N.C. 2001); see also Bonham v. Wolf Creek Academy, 767 F. Supp. 2d 558, 573–74

---

[7] Though Defendants also argue that Plaintiff's UDTPA claim fails because the Act does not apply to employer-employee relationships, the Court agrees with Plaintiff's response that his allegation of conversion is unrelated to his status as Defendants' employee. Thus, the Court declines to address this issue.

34

(W.D.N.C. 2011) (citing Food Lion v. Capital Cities/ABC Inc., 951 F. Supp. 1224, 1230 (M.D.N.C. 1996)); Ellis v. Smith-Broadhurst, Inc., 268 S.E.2d 271, 273–74 (N.C. Ct. App. 1980).

Under the UDTPA, conduct is "unfair if it is unethical or unscrupulous, and it is deceptive it has a tendency to deceive." Dalton, 548 S.E.2d at 711 (citing Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987) (citation omitted)). Plaintiff has neither alleged nor produced evidence demonstrating that Defendants' conduct was deceptive; thus, he carries the burden of showing Defendants' alleged conversion was unfair within the meaning of the UDTPA. This he cannot do because while Plaintiff correctly states that a conversion claim may constitute an UDTPA violation, see, e.g., Global Hookah Distrib. v. Avior, Inc., 401 F. Supp. 653, 633 (W.D.N.C. 2019), the Court agrees with Defendants' argument that the record does not demonstrate that the conversion in this case "offends established public policy" or "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Bartlett v. Milling Co., L.P. v. Walnut Grove Auction & Realty Co., Inc., 665 S.E.2d 478, 487 (N.C. Ct. App. 2008).

In his Response to Plaintiff's Motion for Summary Judgment, Plaintiff asserts four specific acts by Defendants that he contends are unfair or deceptive within the provisions of the UDTPA. However, these allegations are all equally unpersuasive. First, Plaintiff cites his assertion that Defendants took Plaintiff's keys to his home when they terminated him, which meant that he had to ask permission to re-enter his own home in order to move out. However, as explained above, he testified that he kept his apartment keys, and Defendants never denied him access to his apartment. (Doc. No. 31-1, p. 26; Doc. No. 19-2, p. 142–43). In fact, contrary to Plaintiff's argument in his brief, Defendants permitted him to enter to collect his personal belongings well after his lease period ended. See also Davis, 136 S.E.2d at 34.

35

Second, Plaintiff alleges Defendants' refusal of his request for thirty, rather than ten, days in which to vacate his apartment constitutes an unfair or deceptive trade practice. However, Plaintiff knew—both when he signed his lease in 2018 and when he was terminated in 2020—that under the terms of his employee lease, in the event that he was terminated, he would be required to vacate his apartment within ten days after his last day of work. (Doc. No. 19-23, p. 2–3, 12, 32–34; Doc. No. 19-2, p. 56–57). Thus, this allegation fails to demonstrate unfair or deceptive trade practices within the meaning of the Act.

Third, Plaintiff concludes that when Cruz initially informed him that he could have additional time to move out and Brown later "reneged on that offer," their inconsistency constituted evidence of deception and misrepresentation.[8] However, the Court finds no evidence that this miscommunication "was especially egregious or aggravating." Dalton, 548 S.E.2d at 711. Further, any time during which he could have successfully moved out of his apartment that Plaintiff lost as a result of these inconsistent communications is immaterial, given that Defendants permitted Plaintiff to continue to access his apartment to collect his personal property through August 5. (Doc. No. 19-33, p. 2). Though Plaintiff contends he lost three days of his ten-day period, the record demonstrates Plaintiff was given not merely seven days by which to vacate, but instead twenty-three days to do so. (Id. at 36).

---

[8] The Court notes that based on these same communications, Plaintiff's own conduct could be said to demonstrate deception or misrepresentation. When Cruz gave him the initial extension for moving out of his apartment, Defendants were not aware that he was no longer living there, and that instead, his roommate was the sole inhabitant "taking advantage of the [employee] discount." (Doc. No. 19-33, p. 38). Further, Defendant first said that he was planning on vacating by the deadline, but then a week later—and four days past that deadline—Defendant again declared that he would be fully moved out at some point during that week. The Court fails to see how this "reneging" on Plaintiff's word as circumstances changed is any different that the alleged "reneging" on the part of Defendants.

Finally, Plaintiff contends Defendants failed to give him notice that any belongings left in his apartment would be disposed of, and that this omission constitutes unfair or deceptive trade practices. However, Plaintiff was aware of Defendants' policy regarding property left in a vacated apartment unit, (Doc. No. 19-2, p. 33–34), and Plaintiff admittedly failed to inquire about his belongings for over a month. (Doc. No. 19-33). Thus, Plaintiff has not produced any evidence that could reasonably lead a jury to find that Defendants' conduct was unfair or deceptive in violation of the UDTPA. As such, Defendants are entitled to summary judgment as to Plaintiff's unfair and deceptive trade practices claim.

In sum, the Court holds Defendants are entitled to judgment as a matter of law as to Plaintiff's federal claims against both Defendants for interference and retaliation in violation of the FMLA (Claim I), interference under the FFCRA (Claim II), and discrimination and retaliation in violation of the ADA (Claim III), as well as for Plaintiff's claims under North Carolina law for wrongful discharge (Claim IV) and unfair and deceptive trade practices (Claim VIII). Thus, Defendants' Motion for Summary Judgment is GRANTED IN PART as to those claims. Conversely, the Court holds that genuine disputes as to material facts exist regarding Plaintiff's claims for FFCRA retaliation (Claim II), wrongful eviction in violation of North Carolina law (Claim V), conversion (Claim VI), and intentional infliction of emotional distress inasmuch as this claim is based on Plaintiff's FFCRA retaliation and wrongful eviction claims (Claim VII). Therefore, Defendants' Motion for Summary Judgment is DENIED IN PART for these claims.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Doc. No. 19) is GRANTED IN PART and DENIED IN PART. The Court GRANTS summary

judgment in favor of Defendants as to Claims I, II to the extent it asserts a claim of FFCRA interference for leave taken in May 2020, III, IV, and VIII of Plaintiff's Amended Complaint. (See Doc. No. 17).  The Court DENIES summary judgment as to Claims II, to the extent it asserts a claim of FFCRA retaliation for leave taken in May 2020, V, VI, and VII, to the extent it asserts a claim based on Plaintiff's FFCRA retaliation and wrongful eviction claims.

IT IS FURTHER ORDERED that as this matter will proceed to trial on the limited issues of FFCRA retaliation, wrongful eviction, and intentional infliction of emotional distress, the parties shall TAKE NOTICE that as provided for in this Court's Order denying the parties' Joint Motion to Continue Docket Call/Trial, (Doc. No. 33), the parties shall submit their Pretrial Submissions no later than Tuesday, January 3, 2023.  Docket Call will take place at 9:01 a.m. on January 9, 2023, and the Final Pretrial Conference will take place following Docket Call, at 9:15 a.m. on January 9, 2023, in Courtroom #5B of the Charles R. Jonas Federal Building, located at 401 West Trade Street, Charlotte, North Carolina, 28202.

IT IS SO ORDERED.

Signed: December 23, 2022

Frank D. Whitney
United States District Judge